Holder v Jacob (2024 NY Slip Op 03864)

Holder v Jacob

2024 NY Slip Op 03864

Decided on July 18, 2024

Appellate Division, First Department

HIGGITT, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 18, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Anil C. Singh
David Friedman Julio Rodriguez III John R. Higgitt LlinÉt M. Rosado

Index No. 807898/21 Appeal No. 1788 Case No. 2023-03518 

[*1]Terrell Holder, Plaintiff-Respondent,
v
Manju Jacob et al., Defendants-Appellants, Montefiore Health System, Inc., Defendant.

Certain defendants appeal from an order of the Supreme Court, Bronx County (Michael A. Frishman, J.), entered on or about July 13, 2023, which, to the extent appealed from as limited by the briefs, denied their motion to dismiss the complaint.

Mauro Lilling Naparty LLP, Woodbury (Caryn L. Lilling and Seth M. Weinberg of counsel), for appellants.
Gair, Gair, Conason, Rubinowitz, Bloom, Hershenhorn, Steigman & Mackauf, New York (Richard M. Steigman of counsel), for respondent.

HIGGITT, J. 

This appeal gives us occasion to revisit the evidentiary showing a defendant must make to establish entitlement to dismissal of a complaint under CPLR 3211(a)(7), when the motion is premised on a complete affirmative defense (i.e. immunity), as opposed to deficiencies or infirmities in the pleading itself. Here, in response to plaintiff's complaint alleging medical malpractice occurring during the earliest days of the coronavirus pandemic, a hospital, two of its doctors, and one of its nurses seek the protections of former Public Health Law § 3082, a statute that was enacted to immunize, with limited exception, medical providers from civil liability for health care rendered during that fraught time. We find that Supreme Court correctly denied the motion.
I.
In March 2020 alone, New York State recorded its first 83,000 cases of the deadly coronavirus disease (see Matter of People v Quality King Distribs., Inc., 209 AD3d 62, 64 [1st Dept 2022]). The Governor declared a state of emergency on March 7, 2020, and thereafter issued numerous Executive Orders modifying or suspending various provisions of law pursuant to his authority under Executive Law § 29-a, to facilitate the State's and our collective responses to the disaster. Among them was Executive Order 202.10, issued March 23, 2020, which temporarily modified or suspended, through April 22, 2020, several provisions of the Education Law
"to the extent necessary to provide that all physicians, physician assistants, specialist assistants, nurse practitioners, licensed registered professional nurses and licensed practical nurses shall be immune from civil liability for any injury or death alleged to have been sustained directly as a result of an act or omission by such medical professional in the course of providing medical services in support of the State's response to the COVID-19 outbreak, unless it is established that such injury or death was caused by the gross negligence of such medical professional" (Executive Order [A. Cuomo] No. 202.10 [9 NYCRR 8.202.10] [emphasis added]).
The affected statutes — Education Law §§ 6527(2), 6545 and 6909(1) — already provided for immunity to, respectively, physicians, physicians assistants, and licensed registered professional and practical nurses, for "first aid or emergency treatment at the scene of an accident or other emergency, outside a hospital, doctor's office or any other place having proper and necessary medical equipment," except in the [*2]case of gross negligence.
Thereafter, "to address the burdens of health care providers who had been stretched unbearably thinly" by the pandemic (Townsend v Penus, 2021 NY Slip Op 32375[U], *4 [Sup Ct, Bronx County 2021]), the legislature enacted the Emergency or Disaster Treatment Protection Act (EDTPA) (former Public Health Law art 30-D, §§ 3080-3082, as added by L 2020, ch 56, § 1, part GGG, as amended by L 2020, ch 134, §§ 1-2, and as repealed by L 2021, ch 96, § 1). Effective April 3, 2020, and "deemed to have been in full force and effect on or after March 7, 2020" (L 2020, ch 56, § 1, part GGG, § 2), the Act, among other things, afforded immunity from civil and criminal liability to health care facilities and health care professionals:
"A public health emergency that occurs on a statewide basis requires an enormous response from state and federal and local governments working in concert with private and public health care providers in the community. The furnishing of treatment of patients during such a public health emergency is a matter of vital state concern affecting the public health, safety and welfare of all citizens. It is the purpose of this article to promote the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency" (former Public Health Law § 3080).
The version of former Public Health Law § 3082 in effect at the relevant time stated:
"1. Notwithstanding any law to the contrary, except as provided in subdivision two of this section, any health care facility or health care professional shall have immunity from any liability, civil or criminal, for any harm or damages alleged to have been sustained as a result of an act or omission in the course of arranging for or providing health care services,[FN1] if:
"(a)the health care facility or health care professional is arranging for or providing health care services pursuant to a COVID-19 emergency rule or otherwise in accordance with applicable law;
"(b) the act or omission occurs in the course of arranging for or providing health care services and the treatment of the individual is impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives; and
"(c) the health care facility or health care professional is arranging for or providing health care services in good faith.
"2. The immunity provided by subdivision one of this section shall not apply if the harm or damages were caused by an act or omission constituting willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm by the health care facility or health care professional providing health care services[*3], provided, however, that acts, omissions or decisions resulting from a resource or staffing shortage shall not be considered to be willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm" (emphasis added).
Public Health Law § 3082(1) thus set forth the three-part showing a medical provider must make to demonstrate entitlement to immunity under the statute's protections (see Mera v New York City Health & Hosps. Corp., 220 AD3d 668, 669 [2d Dept 2023]; Ruth v Elderwood at Amherst, 209 AD3d 1281, 1282 [4th Dept 2022]; Figueroa v Nayak, 2024 NY Slip Op 30871[U], *5 [Sup Ct, NY County 2024]).
II.
Plaintiff was admitted to Montefiore Medical Center at approximately 4:00 a.m. on April 7, 2020, after appearing at the emergency department with complaints relating to ulcerative colitis. At approximately 5:30 a.m., he was discovered on the floor of his room by a nurse, defendant Manju Jacob, who noted that he had fallen while attempting to reach the bathroom, and was assisted back to bed (this encounter was entered into plaintiff's medical chart at approximately 7:15 a.m.). Within minutes after defendant Jacob's discovery of plaintiff, defendant Joseph Gross examined him, noting, as is relevant here, that plaintiff complained of neck pain and a right-sided headache with associated sensitivity to light and sound, as well as abdominal pain. Plaintiff had initially reported a history of migraines but denied same upon repeat questioning. Defendant Edward Bahou examined plaintiff approximately a half hour later, largely concurring with defendant Gross's findings. Plaintiff apparently made no mention of his fall to defendant Gross or Bahou.
At approximately 11:12 a.m., plaintiff was noted to be "screaming" in pain. The physician noted, without noting the source of this information, that plaintiff had called his family at approximately 6:00 a.m., reporting to them that he hit the back of his head when he fell. In light of this history, the physician ordered a CT scan, which revealed an intraparenchymal hemorrhage requiring surgical intervention and an extended hospitalization.[FN2]
Plaintiff's complaint alleges that defendants rendered medical care negligently and failed to administer proper treatment to plaintiff, thus deviating from approved, standard, and accepted medical care, by failing, among other things, to timely diagnose and treat plaintiff's intracranial bleed and related conditions, which led to severe and permanent physical injuries, including hemiplegia.
III.
Defendants moved, pursuant to CPLR 3211(a)(7), for an order dismissing the complaint. They did not contend that the complaint's allegations failed to adequately assert a cause of action for medical malpractice; rather, their motion rested on the ground that they were immune from liability under Public Health Law Article 30-D and Executive Order 202.10. In support of their motion, they submitted nearly 7,000 pages of plaintiff's medical [*4]records; the affidavits of defendants Jacob, Gross, and Bahou; and the affidavit of Montefiore's vice president and chief quality officer, Dr. Peter Shamamian.
Defendants described the impacts of the newly identified coronavirus on their practices as medical professionals, including dramatically increased patient loads; time spent changing protective gear for each patient encounter, which reduced the time they could spend with patients; shortages of medical supplies; staffing shortages; and redesignation of patient wards.
Dr. Shamamian described the immediate and massive impact the pandemic had on the operation of the hospital generally and the ward where plaintiff was admitted, and the environment in which medical providers were attempting to quickly adapt to the ever-changing understanding and demands of the disease while continuing to provide care to all patients. According to Dr. Shamamian:
"Nearly every aspect of the manner Montefiore was run, including its hiring protocols, the distribution of information, the treatment of patients, the conversion of departments and hospitals, the admission of patients, the nursing protocols, the chart documentation, the administration of pharmaceuticals, and the use and obtainment of Personal Protective Equipment [PPE], was impacted by the COVID-19 pandemic. The massive changes to Montefiore, together with the staffing shortages, increasing patient population and the considerable care and attention COVID-19 patients required, directly impacted the care administered to all patients admitted to Montefiore at the time of plaintiff's admission . . . [Plaintiff] was cared for during the phase of the pandemic when patient load was high and medical professionals were trying to determine the best methods to care for patients who had a new disease. This had ripple effects across every aspect of hospital operations, including the treatment of this particular patient. Given the circumstances faced by all of the providers at Montefiore Medical Center, there is simply no way care could have been rendered in a different fashion than it was in this case. Providers were placed in an unprecedented environment, and every decision they made was, at least in part, a product of that environment."
Dr. Shamamian explained that the nurse-to-patient ratio on the floor where plaintiff was admitted had increased from one-to-four to one-to-seven, because the floor was at 89% to 97% capacity during plaintiff's stay and because of staffing shortages due to the pandemic. He further explained that, given the density of the COVID-positive population on the floor, the increased care a COVID-positive patient required, and the added tasks required of nurses, such as accompanying patients during transport and communicating with families because of restricted visitation, the number of nurses available to treat patients, and the speed at which they could treat, was impacted. He stated, "This would have included plaintiff in this case. There [*5]was no patient whose care would not have been impacted by these staffing issues."
He explained that the pandemic-induced increase in staff-to-patient ratios delayed providers from seeing patients, and "the need to spend 10 to 15 minutes changing into PPE before a provider could enter a patient's room also delayed and necessarily limited the rendering of care to all patients." Dr. Shamamian explained the critical nature of PPE at a time when the mode of transmission of the disease was still unclear: it lowered the risk of transmission of infection from providers to those outside the hospital, between COVID and non-COVID patients, and of an already-compromised provider population that would have further worsened the ratio of providers to patients.
In opposition, plaintiff submitted the affirmation of a physician who opined as to defendants' alleged departures from good and accepted medical practice. The expert did not opine as to the impact, or lack thereof, of the pandemic on any aspect of plaintiff's treatment.[FN3]
Supreme Court denied the motion, finding that defendants had not conclusively established a defense under the Public Health Law, because they had not demonstrated that the pandemic affected plaintiff's treatment "such that his condition could not be properly diagnosed and promptly treated" (Holder v Jacob, 2023 NY Misc LEXIS 19260, *7-8 [Sup Ct, Bronx County, July 13, 2023, No. 807898-2021E]). Specifically, Supreme Court found that defendants failed to establish, as a matter of law, that the alleged departures "were the result of a direct impact from defendants' response to the pandemic" (id. at *8).
IV.
Public Health Law § 3082 "does not qualify how treatment must be affected — whether positively, negatively, or otherwise — it merely requires that treatment be 'impacted'" (Matos v Chiong, 2021 NY Slip Op 32047[U], *1 [Sup Ct, Bronx County 2021]). It does not require that the plaintiff's treatment be uniquely impacted as compared to other patients (see Crampton v Garnet Health, 73 Misc 3d 543, 560 [Sup Ct, Orange County 2021]). It does not identify any particular aspect of, or the materiality of any aspect of, a patient's treatment that must be impacted to warrant a finding that the immunity statute is applicable.
A court may not " 'legislate under the guise of interpretation' " (Matter of Alvarez v Annucci, 38 NY3d 974, 977 [2022], quoting People v Finnegan, 85 NY2d 53, 58 [1995]) by "inserting words that are not there, [or reading] into a statute a provision which the Legislature did not see fit to enact" (People v Page, 35 NY3d 199, 208 n 4 [2020] [internal quotation marks omitted], cert denied  US , 141 S Ct 601 [2020]; see McKinney's Cons Laws of NY, Book 1, Statutes §§ 94, 97). Critically, "[c]ourts may not create a limitation that the Legislature did not enact" (James B. Nutter & Co. v County of Saratoga, 39 NY3d 350, 356 [2023] [internal quotation marks omitted]), because "where as here the statute describes the particular [*6]situations in which it is to apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" (Patrolmen's Benevolent Assn. of City of N.Y. v New York, 41 NY2d 205, 208-209 [1976] [internal quotation marks omitted], citing McKinney's Cons Laws of NY, Book 1, Statutes, § 240). Therefore, we will not narrow the standard of immunity beyond "treatment of the individual."
While defendants have offered several definitions of the phrase "impacted by," no appellate court has resolved the parties' true dispute, which is as to what, specifically, the target or object of the impact must be for the immunity statute to apply. Whatever the appropriate interpretation of the scope and standard of the immunity intended by the legislature in enacting the EDTPA, we find that, even employing the interpretation urged by defendants, it is, nevertheless, defendants' failure to conclusively establish the immunity statute's applicability, as written, that compels our conclusion.
V.
CPLR 3211(a)(7) permits a party to move for judgment dismissing a cause of action where "the pleading fails to state a cause of action." In assessing the sufficiency of the complaint, "[the court] must accept [plaintiff's] allegations as true" (Connolly v Long Is. Power Auth., 30 NY3d 719, 728 [2018]), "liberally construe a pleading . . . and accord those allegations the benefit of every possible favorable inference in order to determine whether those facts fit within any cognizable legal theory" (Molina v Phoenix Sound, 297 AD2d 595, 596 [1st Dept 2002]). "Dismissal of the complaint is warranted if the plaintiff fails to assert facts in support of an element of the claim, or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]).
In its purest form, the motion is directed to the sufficiency of the allegations contained within the complaint itself, unsupported by proof other than the challenged pleading. When the CPLR 3211(a)(7) motion is directed exclusively at the sufficiency of the pleading, "the sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail" (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]). It is the adequacy of the pleading itself, alone, that the court considers (see Davis v Boeheim, 24 NY3d 262, 268 [2014]). "If . . . [plaintiff is] entitled to relief on any reasonable view of the facts stated, [the court's] inquiry is complete and [the court] must declare the complaint legally sufficient" (Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 318 [1995]; see also Aristy-Farer v State of New York, 29 NY3d 501, 509 [2017]; EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).
Where, as here, evidentiary material [*7]such as affidavits is submitted in support of the motion, the focus is no longer merely on the adequacy of the complaint's allegations; such evidence must conclusively establish a defense to plaintiff's claims as a matter of law (see Goldman v Metropolitan Life Ins. Co., 5 NY3d 561, 571 [2005]; David D. Siegel & Patrick M. Connors, New York Practice § 265 [6th ed]).
In reaching our conclusion, we adhere to well-established principles governing motion practice when seeking a CPLR 3211 dismissal: that "a defendant can submit evidence[, such as affidavits or testimony,] in support of [a CPLR 3211(a)(7)] motion attacking a well-pleaded cognizable claim" (Basis Yield Alpha Fund [Master] v Goldman Sachs Group, Inc., 115 AD3d 128, 134 [1st Dept 2014]); that doing so changes the CPLR 3211 inquiry from whether the pleader has stated a cause of action to whether the pleader has a cause of action amenable to relief (see IIG Capital LLC v Archipelago, L.L.C., 36 AD3d 401, 402 [1st Dept 2007], citing Guggenheimer, 43 NY2d at 275), or whether the defendant has a complete defense to the claims (see Matter of Haberman v Zoning Bd. of Appeals of the City of Long Beach, 152 AD3d 685, 688 [2d Dept 2017], lv dismissed 31 NY3d 945 [2018]; Weinstock v Sanders, 144 AD3d 1019 [2d Dept 2016]); and that such evidence must conclusively establish a defense to plaintiff's claims as a matter of law (Goldman, 5 NY3d at 571). With these principles in mind, we find that defendants' CPLR 3211(a)(7) motion to dismiss plaintiff's complaint was properly denied.
Here, of the three conditions imposed by former Public Health Law § 3082(1), there is no question that defendants were arranging for or providing health care services as per the statute, and were doing so in good faith. The parties' dispute distills to whether defendants established, conclusively, that "the treatment of [plaintiff was] impacted by [defendants'] decisions or activities in response to or as a result of the COVID-19 outbreak" (former Public Health Law § 3082[1][b]).
The affidavits submitted by defendants described numerous and pervasive systemic changes to hospital operation and patient care occasioned by the pandemic. And they certainly suggested that plaintiff's treatment — "the treatment of the individual" — was impacted "by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives" (id.). The proof submitted in support of defendants' motion, made pursuant to CPLR 3211(a)(7), however, must conclusively establish the impact on the treatment rendered to plaintiff, and suggestion is not conclusiveness (see Rovello v Orofino Realty Co., 40 NY2d 633, 636 [1976]).
While we appreciate that it may be difficult to recollect and transcribe individual instances in which the care of a particular patient — even if similarly situated to every, or at least other, patients — was impacted by a hospital's [*8]or provider's choices or activities, particularly at a time when recordkeeping strictures were relaxed under Executive Order 202.10 in favor of focusing attention on action, the proof required on a motion made pursuant to CPLR 3211(a)(7), and our role in reviewing that proof, has remained unchanged. Where, as here, the CPLR 3211(a)(7) motion is predicated on what is asserted to be a complete defense, and that motion is supported by evidence, the evidence of the defense must be conclusive (see Lawrence v Graubard Miller, 11 NY3d 588, 595-596 [2008]).
A statute conferring immunity must be strictly construed (Brown v Bowery Sav. Bank, 51 NY2d 411, 415 [1980]), and a party seeking its protections "must conform strictly with its conditions" (Zaldin v Concord Hotel, 48 NY2d 107, 113 [1979]). In this regard, we note that only minimal discovery had been conducted at the time the motion was made, and that the applicability of the defense, itself, requires a fact-intensive inquiry. Whether or not defendants may ultimately be able to demonstrate that they are entitled to immunity, it is premature to deem the analysis completed at this juncture (see Miglino v Bally Total Fitness of Greater N.Y., Inc., 20 NY3d 342, 351 [2013]; Grassi & Co., CPAS, P.C. v Honka, 180 AD3d 564, 565 [1st Dept 2020]).
We are aware of other decisions that have examined the issue and found that a moving defendant made the requisite showing on a CPLR 3211(a)(7) motion to establish the defense (see Martinez v NYC Health & Hosps. Corp., 223 AD3d 731 [2d Dept 2024]; Whitehead v Pine Haven Operating LLC, 222 AD3d 104 [3d Dept 2023]; Mera, 220 AD3d at 670). We are also aware of our own recent finding that a defendant established entitlement to immunity and dismissal of the complaint under CPLR 3211(a)(1) (see Hasan v Terrace Acquisitions II, LLC, 224 AD3d 475 [1st Dept 2024]).
We find, however, that, on the record before us, the moving defendants failed to establish, conclusively, that "the treatment of the individual [was] impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak" (former Public Health Law § 3082[1][b]), such that they are entitled to immunity from liability for the acts and omissions underlying plaintiff's claims, warranting dismissal of plaintiff's complaint at this time.
VI.
As a final matter, we reject defendants' argument that Executive Order 202.10 provides an independent basis for complete immunity warranting dismissal of the complaint. The EDTPA, although enacted later, was deemed to have been in full force and effect prior to the issuance of Executive Order 202.10 (see L 2020, ch 56, § 1, part GGG, § 2), and the similarities in language have led several courts to conclude that the EDTPA was a codification of the immunity contained in Executive Order 202.10 (see e.g. Murray v Staten Is. Care Ctr., 82 Misc 3d 1220[A], 2024 NY Slip Op 50347[U], *4-5 [Sup Ct, Richmond County [*9]2024]; Kalogiannis v New York Ctr. for Rehabilitation & Nursing, 80 Misc 3d 1219[A], 2023 NY Slip Op 51039[U], *2 [Sup Ct, Queens County 2023]; Quattlebaum v Dragomir, 80 Misc 3d 1203[A], 2023 NY Slip Op 50908[U], *3 [Sup Ct, Nassau County 2023]; Spearance v Snyder, 73 Misc 3d 769, 770 [Sup Ct, Onondaga County 2021]), such that the Executive Order was "subsumed" into the EDTPA (see Catapano v S&L Birchwood, LLC, 2024 NY Misc LEXIS 1712, *4 n 1 [Sup Ct, Suffolk County, Jan. 11, 2024, No. 607494/2022] [declining to analyze immunity under Executive Order 202.10 independently of the EDTPA]).
Decisions analyzing Executive Order 202.10 separately from the EDTPA as an independent basis for health care provider immunity are few (see e.g. Murray, 2024 NY Slip Op 50347[U]; Arnott v Perlman, 2023 NY Misc LEXIS 28921 [Sup Ct, Nassau County, Apr. 10, 2023, No. 607317/2021]; Whitehead v Pine Haven Operating LLC, 75 Misc 3d 985 [Sup Ct, Columbia County 2022], revd in part on other grounds 222 AD3d 104 [3d Dept 2023]; Hampton v City of New York, 2021 NY Misc LEXIS 40414 [Sup Ct, Bronx County, June 3, 2021, No. 28392/20E]). None, however, has found that a defendant established its entitlement to immunity for the acts or omissions of a medical provider under the Executive Order, where it had not established entitlement to such immunity under the EDTPA.[FN4]
In light of the foregoing, we do not reach the parties' arguments with respect to CPLR 3211(d).[FN5]
Accordingly, the order of the Supreme Court, Bronx County (Michael A. Frishman, J.), entered on or about July 13, 2023, which, to the extent appealed from as limited by the briefs, denied defendants' motion to dismiss the complaint, should be affirmed, without costs.
Order, Supreme Court, Bronx County (Michael A. Frishman, J.), entered on or about July 13, 2023, affirmed, without costs.
Opinion by Higgitt, J. All concur.
Singh, J.P., Friedman, Rodriguez, Higgitt, Rosado, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 18, 2024

Footnotes

Footnote 1: "Health care services," as defined in the version of Public Health Law § 3081 in effect at the time of plaintiff's alleged treatment and care, included "services provided by a health care facility or a health care professional, regardless of the location where those services are provided, that relate to . . . the care of any . . . individual who presents at a health care facility or to a health care professional during the period of the COVID-19 emergency declaration" (former Public Health Law § 3081[5][c]).

Footnote 2: While the medical records indicate that the rupture preceded and caused plaintiff's fall, the precise etiology has not been established, and is not at issue on this appeal.

Footnote 3: Plaintiff also cross-moved for leave to amend the complaint. Supreme Court's denial of that cross-motion is not before us.

Footnote 4: To the extent defendants argue that the Executive Order provides immunity from plaintiff's claims, articulated in his bills of particulars, arising from defendants' failure to maintain accurate medical records, authority suggests that such claims would be precluded (see Hampton, 2021 NY Misc LEXIS 40414, *8).

Footnote 5: We note that the procedural posture of this case — a CPLR 3211(a)(7) motion made before significant discovery that rests on affidavits from the moving defendants on matters particularly within their knowledge — placed plaintiff in the position of having to accept defendants' word on potentially dispositive issues. Therefore, even assuming defendants' evidence otherwise made the requisite "conclusive" showing, we would be inclined to afford plaintiff discovery before allowing for accelerated judgment in defendants' favor.