DeJesus v Montefiore Med. Ctr. (2024 NY Slip Op 51142(U))

[*1]

DeJesus v Montefiore Med. Ctr.

2024 NY Slip Op 51142(U)

Decided on September 3, 2024

Supreme Court, Bronx County

Frishman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 3, 2024
Supreme Court, Bronx County

Mariel DeJesus, Plaintiff(s),

against
Montefiore Medical Center, Defendant(s).

Index No. 805297/2021E

Counsel for plaintiff: 
Bruce Povman, Esq.
Pena & Kahn, PLLC
1250 Waters Place, Suite 901
Bronx, New York 10461
(718) 585-6551
Counsel for defendant:
Mario C. Giannettino, Esq.
Kaufman Borgeest & Ryan LLP
200 Summit Lake Drive, First Floor
Valhalla, NY 10595
(914) 449-1000

Michael A. Frishman, J.

The following papers numbered 32-63 were read on this Motion for Summary Judgment (Seq. No. 001).
Sequence No. 001 NYSCEF Doc. Nos.
Notice of Motion, Affirmation in Support, Statement of Material Facts — Exhibits and Affirmations and Affidavits Annexed 32 — 51
Affirmation in Opposition, Response to Statement of Material Facts, Statement of Material Facts - Exhibits and Affirmations Annexed 53 — 56
Reply Affirmation, Exhibits Annexed 57 — 63
The motion of defendant MONTEFIORE MEDICAL CENTER (hereinafter "MMC" or "defendant") seeking summary judgment and dismissing the complaint on the ground that MMC is immune from liability under New York's Emergency or Disaster Treatment Protection Act [*2]("EDTPA"), Executive Order 202.10, the federal Public Readiness and Emergency Preparedness Act ("PREP Act"), and/or on the ground that there are no triable issues of fact as to the alleged departures from the standard of care or proximate causation, is hereby granted for the reasons discussed infra.
Plaintiff commenced this medical malpractice action to recover damages in connection with the prevention and treatment of pressure ulcers during plaintiff's hospitalization at MMC. Plaintiff asserts claims for medical malpractice and gross negligence for the period of April 8, 2020, to April 15, 2020.[FN1]

On March 24, 2020, plaintiff, then 53 years old, presented to the Westchester Square emergency department with complaints of shortness of breath, loss of appetite, cough and fever which had persisted for five days. A history of asthma was noted. An x-ray was performed which revealed bilateral infiltrates consistent with multifocal pneumonia. Plaintiff tested positive for COVID-19, and she was transferred and admitted to MMC Moses for treatment. On March 27, 2020, plaintiff was hypoxic and was provided hydroxychloroquine. Between March 31, 2020, and April 1, 2020, plaintiff's condition worsened. On April 2, 2020, plaintiff experienced acute hypoxic respiratory failure and was transferred to the intensive care unit ("ICU") where she was intubated and placed on a ventilator, and an enteral feeding tube and Foley catheter were placed. The use of a ventilator required sedation and limited plaintiff's positioning. Records indicate that plaintiff was placed in the prone position and supine position at intervals, and tube feeds required the head of her bed to be elevated 30-45 degrees. A care plan for skin protection was put in place, which included, among other things, turning and positioning, and utilization of a pressure redistributing mattress. Records also indicate that a physical examination was deferred to minimize personal protective equipment ("PPE") use and physical contact with patients who are COVID-19 positive. A note dated April 6, 2020, indicates that turning and positioning was performed. On April 7, 2020, skin assessments documented the absence of pressure injuries. Skin intervention notes dated April 8, 2020, indicate that a pressure redistributing turning device was used, pressure redistributing mattress was utilized, and a specialty bed was utilized.
On April 8, 2020, and April 10, 2020, telemedicine consults were performed, noting that they were prepared without a bedside examination to prevent the spread of infection and conserve PPE during the pandemic. On April 11, 2020, nurse Jasmine Moya documented being unable to place a rectal tube due to external hemorrhoids. On April 14, 2020, notes indicate that a skin assessment revealed no pressure injuries. On April 15, 2020, plaintiff was extubated and was transferred from critical care to the medical floor. Upon transfer, pressure ulcers were noted on the right and left buttocks. On April 15, 2020, Roman Zinder, M.D., attending wound care physician, performed a wound consultation which revealed a stage III wound on the right buttock measuring 6.2 cm x 4.7 cm x 1 cm, and a stage III wound on the left buttock measuring 7.5 cm x 6.8 cm x .2 cm, and a wound care plan was ordered. On April 16, 2020, plaintiff was noted to be awake, alert, and stable. Plaintiff was discharged from MMC on April 22, 2020, and transferred to Burke Rehab for acute inpatient rehabilitation to return independence in functional mobility.
In early 2020, executive orders were signed declaring a disaster emergency in New York State in response to the COVID-19 pandemic (see Executive Order [A. Cuomo] No. 202 [9 NYCRR 8.202]). On March 23, 2020, recordkeeping strictures were relaxed, and health care workers were granted immunity from civil liability, except for instances of gross negligence, for any injury or death alleged to have been sustained directly as a result of providing medical services in support of New York's response to the COVID-19 pandemic (see 9 NYCRR 8.202.10). Thereafter, "to address the burdens of health care providers who had been stretched unbearably thin" by the pandemic (Holder v Jacob, — AD3d —, 2024 NY Slip Op 03864, *2 [1st Dept 2024] [internal citation and quotations omitted]), the legislature then enacted the EDTPA (Public Health Law former §§ 3080—3082). For immunity to attach under the EDTPA's protections, a medical provider must establish three requirements: (1) that the health care services were provided to the patient pursuant to a COVID-19 emergency rule or applicable law; (2) that the services were "impacted" by decisions or activities in response to the COVID-19 pandemic and in support of the State's directives; and (3) the health care services to the patient were provided in good faith (see Public Health Law former § 3082 [1]). While instances of gross negligence were excluded from protection under the EDTPA, the statute provided that "acts, omissions or decisions resulting from a resource or staffing shortage shall not be considered to be willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm" (Public Health Law former § 3082 [c] [2]). The EDTPA was prospectively repealed on April 6, 2021, and still applies to acts or missions that occurred from March 7, 2020, through April 6, 2021 (Hasan v Terrace Acquisitions II, LLC, 224 AD3d 475, 476 [1st Dept 2024]).
The federal PREP Act contains liability protections for pandemic countermeasures taken by certain "covered persons" in response to a declaration of a public health emergency by the Secretary of Health and Human Services. The immunity provided under the PREP Act "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure" (see 42 USC § 247d-6d [a] [2] [B]). However, the PREP Act preempts state claims and confers immunity only where the allegations are that the defendant dispensed or administered countermeasures improperly, causing injury (Parker v St. Lawrence County Pub. Health Dept., 102 AD3d 140 [3d Dept 2012]).
Defendant seeks summary judgment arguing that this matter should be dismissed under the EDTPA, the PREP Act, Executive Order 202.10, and ordinary malpractice principles. In support of the motion, defendant submits, among other things, the deposition transcripts of Roman Zinder, M.D., wound care physician at MMC, and Jaya Saxena, M.D., hospitalist at MMC; the affirmation of Joshua Schwarzbaum, M.D., Board Certified in Emergency Medicine, Addiction Medicine, and Emergency Medical Services; the affidavit of Lindsey Ittoop, Registered Nurse; and the affidavit of Heidi Cross, Board Certified Wound and Ostomy Nurse and Board Certified Family Nurse Practitioner.
Dr. Zinder testified that the wound care team at MMC in March of 2020 was comprised of himself and a physician assistant, who ended up contracting COVID-19. In April of 2020 there were over 1700 patients admitted at the three MMC campuses, the majority of which were COVID-19 positive. Dr. Zinder testified that at that time, "everything" at MMC was converted [*3]to ICUs, including operating rooms and parts of the gift shop. The number of patients he saw "skyrocketed," and in order to perform examinations involving wounds on the back, sacrum, and buttocks, an assistant was almost always needed. Dr. Zinder testified that the extensive COVID-19 protocols dramatically increased the amount of time it would take to conduct a proper wound care examination, and there was difficulty locating consults because there were new units created, resulting in it taking up to forty minutes to locate a patient. Dr. Zinder described MMC as "a war zone," with beds everywhere, with and without ventilators, and patients having IV lines running from rooms to the outside to enable nurses to change IV drips without going into the patient's room. Dr. Zinder testified that it was unrealistic to expect nurses to turn and reposition a patient every one to two hours under the circumstances presented by the COVID-19 pandemic, and the fact that a patient is on a ventilator restricts the ability to turn the patient. Dr. Zinder first examined the plaintiff on April 15, 2020, at which time an examination revealed an early-stage III pressure injuries on the right and left buttocks. Dr. Zinder testified that while wound progression varies by individual, pressure injuries can be developed in one to eight hours when the patient stays in one position for a prolonged period of time.
Dr. Saxena was an attending hospitalist at MMC during plaintiff's hospitalization. Dr. Saxena testified that her duties were impacted as a result of COVID-19, specifically, by the PPE protocols. Dr. Saxena described the atmosphere at MMC as "very chaotic." Dr. Saxena examined the patient on April 16, 2020, although she had no recollection of plaintiff. Dr. Saxena was unable to testify as to the duties or responsibilities of nursing staff, or whether there was a shortage of PPE at MMC.
Dr. Schwarzvaum explains that plaintiff's hospitalization occurred during a time when all hospitals in New York were required by state Executive Orders to rapidly deploy and supplement physician staffing to care for an expanding inpatient census; develop processes for the triage and appropriate care of patients; develop processes for declining non-COVID-19 patients; expand ICUs and non-traditional care spaces; and adopt other strategies to deliver care in extremely challenging and distressing conditions. Dr. Schwarzvaum further explains that, while under "normal" standards of care, an ICU patient such as plaintiff would require turning and positioning every 2-4 hours, due to the COVID-19 pandemic, conventional standards of care were not feasible and unable to be maintained during this time.
Dr. Schwarzvaum opines that, inter alia: as a result of being COVID-19-positive, plaintiff was placed on contact and droplet isolation precautions, which required caregivers to, among other things, don and doff PPE; despite reasonable attempts made to incorporate prevention strategies, the COVID-19 crisis made it impossible to maintain plaintiff's skin integrity, as she was on a ventilator and sedated; as a COVID-19 patient with acute respiratory distress syndrome, prone positioning was used to assist with breathing, which expanded lung volume and decreased the pressure on the lungs, and is often used for many hours and/or days and "turning" is limited to small position changes; plaintiff was placed in the supine position with the head of the bed elevated due to her need for a feeding tube; in the context of the critically ill COVID-19 patient, there is a greater potential of being unable to safely turn the patient due to the profound hypoxia and/or hemodynamic instability; it would take several people to turn plaintiff due to her sedation and ventilation, and each change in position puts the lines and tubes that support critical life functions at risk, therefore repositioning may compromise oxygenation and life; and under the circumstances, pressure injury formation was unavoidable.
Nurse Cross explains that during plaintiff's hospitalization, MMC had to adopt new strategies to reduce the spread of the COVID-19 virus, which included social distancing, maximizing availability of PPE due to anticipated shortages, and the imposition of widespread infection control measures such as contact and droplet and isolation precautions. Cross explains that healthcare providers, including MMC, had to expand the availability of healthcare providers, retro fit existing hospital space to serve as makeshift ICUs and ultimately, prioritize patient care. Cross avers that the pandemic dramatically altered the standard of care, which required providers to do whatever could be done to save the patients with a new disease from dying, and everything else was secondary. As a result, to the extent there was a standard of care in March and April 2020, that standard of care would at best be considered a "crisis" standard of care where providers did whatever they could, whenever they could, to keep patients alive while the public health system was stretched beyond its capacity. Cross explains that while a care plan was in place for skin protection, COVID-19 patients with acute respiratory distress syndrome were often placed in the prone position many hours and/or days, and it is not practicable to expect that skin would remain intact within the setting of plaintiff's COVID-19 hospitalization. Cross avers that not only did the number of wound consults at MMC increase dramatically, but the time it would take to conduct a proper wound care examination increased due to the COVID-19 protocols in place. Cross notes that during plaintiff's hospitalization, two wound care providers covered three MMC campuses because the other wound care team members had developed COVID-19 and were on leave.
Nurse Cross opines that, inter alia: reasonable efforts to provide evidence based preventive care were attempted and documented, including the use of a specialty mattress, skin assessments, and positioning; due to plaintiff's deteriorating condition from COVID-19, she required enteral tube feeds, as a result of which the head of her bed was elevated 30-45 degrees, which by necessity put pressure on her sacrum; the specific positioning requirements were impacts of plaintiff's COVID-19 diagnosis; the providers at MMC did all they could have done to treat plaintiff in the best manner possible under the circumstances; and the development of pressure injuries was unavoidable.
Nurse Ittoop avers that plaintiff was ventilated and placed in a prone position at intervals to help reduce the potential for lung collapse and to improve pulmonary function, which was necessary to promote lung function. Plaintiff also had to be tube fed, which required the head of her bed to be elevated 30-45 degrees to reduce the risk of aspiration pneumonia, requiring her to be placed in an upright position of at least 45 degrees during feedings. Ittoop avers that plaintiff was alternated between supine and prone positions while in the ICU, which were necessary due to her respiratory and dietary needs. Ittoop explains that the ability of the providers to turn and position plaintiff was affected by COVID-19, and as turning her could have further compromised lung function, prone positioning for extended periods of time was implemented in the ICU. As multiple nurses would be needed to turn and position plaintiff since she was on a ventilator, the increased number of critically ill patients made turning and positioning every two to four hours unfeasible under the circumstances presented by the COVID-19 pandemic.
Initially, the Court finds that defendant has failed to establish as a matter of law that plaintiff's claims, which relate to the alleged failure to prevent and treat plaintiff's pressure ulcers, have "a causal relationship with the administration to or use by an individual of a covered countermeasure" (see 42 USC § 247d-6d [a] [2] [B]), such that plaintiff's claims fall within the PREP Act's immunity provision. Notably, defendant has provided no binding authority in [*4]support of their argument regarding the applicability of the PREP Act. Therefore, the Court will analyze the applicability of the EDTPA.
It is undisputed that MMC is a health care facility that was authorized to provide health care services within the meaning of the Public Health Law and did so here in good faith. It is also undisputed that the alleged period of negligent care occurred during the COVID-19 emergency declaration period, and therefore falls within the definition of health care services pursuant to former Public Health Law § 3081 (5) (c).
Even if MMC's submissions were insufficient to establish that MMC's care of plaintiff was a result of "a resource or staffing shortage" as defined by Public Health Law § 3082 (c) (2), through submission of competent affidavits, affirmations, and deposition testimony, MMC has demonstrated that plaintiff's care, including but not limited to MMC's ability to adhere to skin care protocols, was directly "impacted" by decisions or activities in response to the COVID-19 pandemic and in support of the State's directives, satisfying the remaining requirement under the EDTPA. Public Health Law § 3082 "does not qualify how treatment must be affected — whether positively, negatively, or otherwise — it merely requires that treatment be 'impacted'" (Holder, 2024 NY Slip Op 03864, *5) (internal citation and quotations omitted). "It does not require that the plaintiff's treatment be uniquely impacted as compared to other patients [nor does it] identify any particular aspect of, or the materiality of any aspect of, a patient's treatment that must be impacted to warrant a finding that the immunity statute is applicable" (id.). Further, MMC established their entitlement to dismissal of plaintiff's claims of gross negligence by establishing "the absence of any conduct that could be viewed as so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of others" (Vissichelli v Glen-Haven Residential Health Care Facility, Inc., 136 AD3d 1021, 1023 [2d Dept 2016]). Therefore, MMC has demonstrated entitlement to summary judgment and dismissal of plaintiff's claims.
In opposition, plaintiff submits the affirmation of her unnamed expert, Board Certified in Emergency Medicine, Medical Toxicology, and Undersea and Hyberbaric Medicine, and photographs of plaintiff's claimed injuries.
Plaintiff's expert affirms that "throughout the COVID pandemic, including in the year 2020, [he or she] treated both in-patients and out-patients in a major hospital setting." Plaintiff's expert argues that MMC has not presented proof of PPE shortages or statistics regarding staffing shortages at MMC. Plaintiff's expert concedes that it is "somewhat more time consuming" to don PPE but opines that the need to don and doff PPE does not render a hospital incapable of rendering patient care and is not a barrier or impediment to performing good and accepted basic medical standards of skin protection. Plaintiff's expert disagrees with Dr. Zinder's opinion that plaintiff's pressure ulcers could have developed in one to eight hours and opines that it is far more likely that plaintiff's pressure ulcers developed over several days or longer. Plaintiff's expert opines that, inter alia, MMC's care of plaintiff constituted gross departures from the standard of care in diagnosing and treating decubitus ulcers in that not even slight care or conduct was shown for plaintiff's skin integrity after April 7, 2020, which is "evidence of gross negligence." Plaintiff's expert bases this opinion on, among other things, photographs of plaintiff's injuries and the absence of records regarding plaintiff being turned or positioned on any schedule or that the skin protocols in place were adhered to from April 7, 2020, until plaintiff's pressure ulcers were discovered on April 15, 2020. Plaintiff's expert also contends that the fact that the April 11, 2020, notation by nursing staff, which documented being unable to [*5]place a rectal tube due to external hemorrhoids, is evidence of a physical examination in which plaintiff's pressure ulcers should have been observed and skin condition documented. Plaintiff's expert further opines that, even when factoring in the added difficulties caused by COVID to both plaintiff and the MMC staff, the care given was so careless that it completely disregarded the plaintiff's safety as it related to her skin integrity.
Plaintiff's opposition is insufficient to raise an issue of fact. Initially, it is noted that plaintiff's expert does not dispute that COVID-19 dramatically changed the standard of care during the period of plaintiff's hospitalization, and essentially concedes that, at the very least, the COVID-19 pandemic presented hospitals with "difficulties." However, plaintiff's expert otherwise provides no insight into the impact of the COVID-19 pandemic on hospitals, or the lack thereof. Further, the Court finds plaintiff's arguments regarding MMC's failure to present evidence of specific PPE and staffing shortages to be unavailing and unsupported by any binding authority. The Court also rejects plaintiff's expert's characterization of MMC's treatment of plaintiff as "evidence of gross negligence," which appears to be a tailored conclusion to meet statutory criteria, and conclusory and unsubstantiated allegations of gross negligence (see generally Gold v Park Ave. Extended Care Ctr. Corp., 90 AD3d 833, 834 [2d Dept 2011]). To constitute gross negligence, a party's conduct must "smack of intentional wrongdoing or evince a reckless indifference to the rights of others" (Huang v Fort Greene Partnership Homes Condominium, 228 AD3d 912, 916 [2d Dept 2024] [internal citations and quotations omitted]). Significantly, even if plaintiff's allegations are true, under the circumstances presented in this matter, they do not legally constitute gross negligence, as it is clear from the record that MMC did not "abandon" plaintiff (Anzolone v Long Is. Care Ctr., Inc., 26 AD3d 449, 450 [2d Dept 2006], citing Graham v Columbia Presbyt. Med. Ctr., 185 AD2d 753 754 [2d Dept 1992]), and MMC's conduct was not "wanton or malicious" or "activated by evil or reprehensible motives" (Anzolone, 26 AD3d at 450, citing Spinosa v Weinstein, 168 AD2d 32 [2d Dept 1991]). Therefore, plaintiff's submissions are insufficient to warrant denial of the motion.
The Court has considered the parties' remaining arguments and find them unavailing.
Accordingly, it is hereby,
ORDERED that defendant's motion seeking summary judgment is granted; and it is further
ORDERED that the Clerk of the Court is directed to enter judgment in favor of defendant, dismissing the complaint; and it is further
ORDERED that counsel for defendant shall serve a copy of this Order with Notice of Entry on all parties within thirty (30) days of the entry of this Order.
This constitutes the Decision and Order of the Court.
Dated: September 3, 2024
Hon. Michael A. Frishman, J.S.C.

Footnotes

Footnote 1:Plaintiff's bill of particulars asserted claims for the period of March 25, 2020, through April 22, 2020, however, claims of negligence and gross negligence outside of April 8, 2020, to April 15, 2020, were withdrawn in plaintiff's opposition to the instant motion.